**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNY ALLISON and ZORAN HOCEVAR,** | : | **CIVIL ACTION** |
| **individually and on behalf of a class of others** | : | |
| **similarly situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | **NO. 08-467** |
| **v.** | : | |
| | : | |
| **THE GEO GROUP, INC., in its official and** | : | |
| **individual capacities, and JOHN DOES** | : | |
| **1 – 100, in their official and individual** | : | |
| **capacities,** | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                    **MARCH 24, 2009**

**T A B L E   O F   C O N T E N T S**

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
              1.    Penny Allison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
              2.    Zoran Hocevar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
              3.    Plaintiff Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        A.    Legal Standard for Assessing the Constitutionality of Custodial Strip Searches
              Under the Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              1.    Fourth Amendment Rights Generally . . . . . . . . . . . . . . . . . . . . . . 9
              2.    Fourth Amendment Rights in Custodial Facilities . . . . . . . . . . . . . . . 12
              3.    Bell Standard for Custodial Strip Searches . . . . . . . . . . . . . . . . . . . 13
        B.    Defendant's Arguments that Bell No Longer Applies . . . . . . . . . . . . . . . . 14
              1.    Inmates' Fourth Amendment Rights in Custodial Facilities Under Hudson
                    v. Palmer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
              2.    The Turner v. Safley Standard of Review for Prison Regulations . . . . . . 18
        C.    The Constitutionality of Suspicionless Arrestee Strip Searches in Custodial
              Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
              1.    The Constitutionality of Contact Visit Strip Searches Under Bell v.
                    Wolfish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              2.    Circuit Court Rulings on Arrestee Strip Searches in Custodial Facilities
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

| | | a. | The Invasion of Rights that the Search Entails . . . . . . . . . . . . . | 29 |
| | | b. | The Need for the Particular Search . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| | | c. | Reasonableness and Reasonable Suspicion Standard . . . . . . . . | 34 |
| | 3. | Powell v. Barrett and Defendant's Powell-Based Arguments . . . . . . . | 35 |
| | | a. | The Source of the Reasonable Suspicion Standard Identified by Powell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| | | b. | Powell's Rejection of the Misdemeanor-Felony Distinction and the Distinction between Contact Visit Strip Searches and Arrestee Strip Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| | | c. | Fourth Amendment Analysis Absent a Factual Record . . . . . . . | 44 |
| D. | Plaintiffs' Fourth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 |

| **VI.** | **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48 |

<u>**M E M O R A N D U M**</u>

## I.    INTRODUCTION

In this litigation, plaintiffs, detained arrestees at custodial facilities operated by defendant The GEO Group, Inc. ("GEO"), challenge the legality of strip searches conducted by defendants, GEO and John Does 1 – 100.[1] Plaintiffs allege that the searches were performed pursuant to a blanket policy of strip searching all arrestees and that such a policy violates the Fourth Amendment to the Constitution of the United States. This Memorandum addresses the issues presented by defendant GEO's Motion for Judgment on the Pleadings which seeks to dismiss Counts I, II, and III of plaintiffs' Amended Complaint, those that allege Fourth Amendment violations, for failure to state a claim upon which relief may be granted.[2]

Plaintiffs' cause of action is based on <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), the Supreme

---

[1] The Court will use the singular term "defendant" when discussing the alleged strip search policy promulgated by defendant GEO or the Motion for Judgment on the Pleadings filed by defendant GEO. The Court will use the plural term "defendants" when discussing individual strip searches conducted by John Doe defendants pursuant to GEO's alleged strip search policy.

[2] Defendant's motion does not address Count V of plaintiffs' Amended Complaint which asserts a state law negligence claim. Counts IV, VI, and VII of the Amended Complaint were previously dismissed by agreement of the parties. (Order of May 30, 2008.)

2

Court's seminal case on the rights of pretrial detainees. Among other rulings, Bell established the Fourth Amendment standard for determining the constitutionality of strip search policies in custodial facilities.[3] Applying that standard to a blanket policy which mandated strip searches for all inmates returning from contact visits, the Supreme Court upheld the policy as reasonable under the Fourth Amendment. Following Bell, other courts have used the Bell standard to assess the constitutionality of custodial strip search policies in various contexts. Plaintiffs' claims rely on those cases which, in assessing custodial strip searches in the *arrestee* context, strike down blanket polices and the suspicionless searches conducted under those blanket polices as unreasonable and, therefore, unconstitutional.

Defendant's Motion for Judgment on the Pleadings advances three alternative grounds for dismissal. First, defendant argues that plaintiffs' Fourth Amendment claims must fail because, under Hudson v. Palmer, 468 U.S. 517 (1984), inmates in custodial facilities do not possess Fourth Amendment rights. Second, in the event that the Court rejects defendant's Hudson argument, defendant argues that the Court should adjudicate and dismiss plaintiffs' claims according to the standard of review articulated in Turner v. Safley, 482 U.S. 78 (1987), for prison regulations which impinge on inmates' constitutional rights, and not according to Bell's Fourth Amendment standard. Finally, defendant asserts that, even if the Court rejects both of the foregoing arguments and, instead, applies the Bell standard, the outcome in this case is governed by the outcome in Bell, in which the Supreme Court upheld the constitutionality of a blanket strip search policy. In arguing for this application of Bell, defendant relies almost exclusively on

---

[3] For purposes of this Memorandum, the Court uses the term "custodial facility" to refer collectively to jails, prisons, and other detention facilities. The Court uses the term "custodial strip search" to mean a strip search conducted in a custodial facility for non-investigatory purposes.

Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc), a recently issued *en banc* opinion by the Eleventh Circuit which runs directly counter to the holdings of nine other circuits on this issue.

Although the issues before the court have been addressed by many circuit courts, the Third Circuit has never ruled on the constitutionality of strip searches in detention facilities. This Court must, therefore, look to other circuits for persuasive authority. For the reasons stated in this Memorandum, the Court rejects defendant's Hudson and Turner arguments and declines to adopt the Eleventh Circuit's holding in Powell. This Court concludes that under the persuasive authority of nine courts of appeals, plaintiffs have stated a claim for relief. Accordingly, defendant's Motion for Judgment on the Pleadings must be denied.

## II.    BACKGROUND

### A.    Procedural History

Plaintiffs commenced this action by filing a Complaint against GEO and John Does 1 – 100 in their official and individual capacities on January 30, 2008. On March 28, 2008, plaintiffs filed an Amended Complaint against the same defendants. The Amended Complaint asserts the following causes of action against all defendants:

| | |
|---|---|
| Count I: | Monetary damages for Fourth Amendment violations pursuant to 42 U.S.C. § 1983 |
| Count II: | Demand for declaratory judgment as to Fourth Amendment violations |
| Count III: | Demand for preliminary and permanent injunction as to Fourth Amendment violations |
| Count IV: | Battery |
| Count V: | Negligence |
| Count VI: | Intentional Infliction of Emotional Distress |
| Count VII: | Negligent Infliction of Emotional Distress |

On May 2, 2008, GEO filed an unopposed Motion to Dismiss Counts IV, VI, and VII of

Plaintiffs' Amended Complaint. By Order dated May 30, 2008, the Court dismissed those Counts

with prejudice. Defendant's motion to dismiss did not challenge any of plaintiffs' federal claims

(Counts I-III) or plaintiffs' state law negligence claim (Count V). On June 19, 2008, GEO filed

an Answer to the remaining Counts of plaintiffs' Amended Complaint, and the parties proceeded

to conduct discovery.

On September 18, 2008, soon after the issuance of Powell v. Barrett, 541 F.3d 1298 (11th

Cir. 2008) (en banc) on September 4, 2008, GEO filed the instant motion for judgment on the

pleadings. In conjunction with the motion for judgment on the pleadings, defendant filed a

Motion for a Protective Order and Stay of Discovery. By Order dated October 10, 2008, the

Court granted in part and denied in part defendant's Motion for a Protective Order and Stay of

Discovery, partially staying discovery pending the Court's ruling on the Motion for Judgment on

the Pleadings.

### B.        Factual Background[4]

GEO, a Florida corporation, manages numerous correctional, detention, mental health,

and residential treatment facilities in the United States ("Facilities"), including the George W.

Hill Correctional Facility in Thornton, Pennsylvania ("Hill Facility"). (Am. Compl. ¶¶ 15-16, 26,

36.) Plaintiffs aver that in operating its Facilities, defendant has a written or de facto policy of

strip searching "all individuals placed into the custody of the Facilities" including recently

arrested individuals and pretrial detainees. (Id. ¶ 22.) The searches are allegedly conducted

regardless of the existence of reasonable suspicion or probable cause that any particular

individual is carrying weapons or contraband on his person. (Id. ¶¶ 22-23.)

---

[4] This Memorandum recites only those factual allegations contained in the Amended Complaint that are necessary for the determination of the instant motion. All facts are presented in the light most favorable to plaintiffs, the non-moving party.

Plaintiffs Penny Allison ("Allison") and Zoran Hocevar ("Hocevar") each allege that they were subjected to strip searches that were not based on reasonable suspicion. Plaintiffs further allege that a class of similarly situated individuals were subjected to strip searches under similar circumstances, in accordance with the blanket policy and without reasonable suspicion. (Id. ¶¶ 23, 45.) The facts, as they pertain to each named plaintiff and the putative plaintiff class, are as follows.

### 1.    Penny Allison

Plaintiff Allison was arrested and charged with driving under the influence ("DUI") in November 2005. (Am. Compl. ¶ 25.) In lieu of formal prosecution, Allison was placed in a pretrial diversion program known as Accelerated Rehabilitative Disposition ("ARD"). (Id.) In or around July 2006, Allison failed to appear for one of her ARD-related court dates, and a bench warrant issued. (Id. ¶¶ 25-26.)

On July 25, 2006, police officers in Springfield, Pennsylvania stopped Allison for driving with an expired registration sticker and arrested her on the outstanding bench warrant. (Id. ¶ 26.) Following arrest, Allison was transferred to the Hill Facility. (Id.) As part of the intake process, a female officer escorted Allison to a private room and instructed her to remove her clothing, squat, and cough. (Id. ¶ 27.) Allison remained in custody for eight days. (Id. ¶¶ 27-28.) At Allison's next court date, her attorney explained her failure to appear at the earlier court date, and the court ordered that she be released from detention at the Hill Facility. (Id. ¶ 28.)

In or around December 2007, Allison pled guilty to a second DUI charge and was sentenced to fifteen weekends of incarceration. At the time the Amended Complaint was filed, Allison had begun serving her sentence by reporting each weekend to the Hill Facility. On each occasion, Allison was ushered into a room along with all of the other female weekend inmates.

One by one, a corrections officer strip searched each inmate in front of the others. (Id. ¶ 29.)

### 2.   Zoran Hocevar

In or around March 2005, Plaintiff Hocevar was arrested on charges arising out of a domestic dispute. All but one of the related charges were dismissed some time between March 2005 and June 2006.[5] Thinking that all of the charges had been resolved, Hocevar mistakenly failed to appear for a scheduled court date in June 2006. A bench warrant issued. (Am. Compl. ¶ 33.)

Police officers in Montgomery County stopped Hocevar's vehicle in July 2007. (Id. ¶ 34.) Upon discovering the outstanding bench warrant, the officers took Hocevar into custody and transported him to the Hill Facility. (Id.) During his admission to the Hill Facility, Hocevar was strip searched in the presence of other individuals. (Id.)

### 3.   Plaintiff Class

Plaintiffs define the proposed class as:

> All persons who have been or will be placed into the custody of one or more of the Facilities after being detained for misdemeanors, summary offenses, or other crimes that do not involve the possession or distribution of drugs, possession of weapons, or violent felonies, and who were or will be strip searched upon their admission into one or more of the Facilities pursuant to Defendants' . . . uniform practice and procedure of strip searching all pre-trial detainees who enter the Facilities, regardless of the crime or violation for which they are detained, and without making the legally required determination of whether reasonable suspicion exists to justify a strip search.

(Am. Compl. ¶¶ 1, 45.) The salient features of the putative class, for the purposes of ruling on the instant motion are as follows. First, class plaintiffs are minor offenders and/or non-violent, non-drug offenders. Second, class plaintiffs are detained arrestees or pretrial detainees. Finally, class

---

[5] The Amended Complaint states that the charges were dropped in "August of 2007," but this date appears to be erroneous in that it does not match Hocevar's chronology of events.

plaintiffs are subjected to strip searches which are conducted pursuant to a blanket policy and lack individualized reasonable suspicion. (Id. ¶¶ 22-23.) The Court also notes that plaintiffs do not describe the nature of the strip searches mandated by the blanket policy or specify whether the policy requires the inspection of body cavities.

## III.    STANDARD OF REVIEW

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). See Shelly v. Johns-Manville Corp., 798 F.2d 93, 97 n.4 (3d Cir. 1986); Regalbuto v. City of Phila., 937 F. Supp. 374, 376 (E.D. Pa. 1995). A motion for judgment on the pleadings will only be granted where "the plaintiffs would not be entitled to relief under any set of facts that could be proved." Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 220 (3d Cir. 2001).  In determining whether a plaintiff has stated a claim for relief, the court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc., 931 F.2d 1002, 1005 (3d Cir. 1991).

A motion for judgment on the pleadings, like a motion to dismiss, tests the legal sufficiency of a claim in light of the facts pled in the complaint. To survive such a motion, "a civil plaintiff must allege facts that 'raise a right to relief above the speculative level . . . .'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).  In other words, a claim must contain "'enough factual matter (taken as true) to suggest'" the elements of the claims asserted. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 127 S. Ct. at 1965); accord 5 Wright & Miller, Federal Practice and Procedure § 1216, at 236 (3d ed. 2004) ("[T]he pleading must

contain something more [than] a statement of facts that merely creates a suspicion [of] a legally

cognizable right of action."), quoted in Twombly, 127 S. Ct. at 1965.

## IV.    DISCUSSION

Defendant's three grounds for dismissal implicate the legal standard to be applied to

plaintiffs' claims and the application of that standard. The Court begins by providing a brief

summary of relevant Fourth Amendment principles and then addresses each of defendant's

arguments in turn.

### A.    Legal Standard for Assessing the Constitutionality of Custodial Strip Searches Under the Fourth Amendment

#### 1.    Fourth Amendment Rights Generally

The fundamental purpose of the Fourth Amendment is to "safeguard the privacy and

security of individuals against arbitrary invasions" at the hands of the government. Camara v.

Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). To differentiate between unconstitutional invasions

and constitutionally permissible searches, the Fourth Amendment "impose[s] a standard of

'reasonableness' upon the exercise of discretion by government officials." Delaware v. Prouse,

440 U.S. 648, 653-54 (1979). Reasonableness, an inherently flexible standard, generally requires

balancing the "intrusion on the individual's Fourth Amendment interests" against the "promotion

of legitimate government interests." Id. at 654. The standard "is not capable of precise definition

or mechanical application." Bell, 441 U.S. at 559. In each case, the court must determine whether

the challenged search is reasonable under the particular facts and circumstances before the court.

Id.; Terry v. Ohio, 392 U.S. 1, 21 (1968).

In broad terms, the Fourth Amendment has two areas of application. The first, and more

common, context involves the individualized search of a person or his belongings, typically in

relation to a criminal investigation. In such cases, "the reasonableness standard usually requires,

at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." Prouse, 440 U.S. at 654; accord City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000). In a later opinion, the Court ruled that there are only two objective standards for the purposes of the Fourth Amendment—probable cause and reasonable suspicion. United States v. Montoya de Hernandez, 473 U.S. 523, 540-41 (1985).

The second context involves suspicionless searches conducted pursuant to search policies. "In [some] situations . . . the balance of interests precludes insistence upon 'some quantum of individualized suspicion.'" Prouse, 440 U.S. at 654-55; accord Hudson v. Palmer, 468 U.S. 517, 537-38 (O'Connor, J., concurring) ("In some contexts, . . . the Court has rejected the case-by-case approach to the 'reasonableness' inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion."). These searches are often referred to as "special needs" searches because they serve interests "other than the ordinary needs of law enforcement." Chandler v. Miller, 520 U.S. 305, 313 (1997); Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989). The instant case requires this Court to rule on whether the strip searches alleged by plaintiffs belong to "the closely guarded category of constitutionally permissible suspicionless searches." Chandler v. Miller, 520 U.S. 305, 309 (1997).

By virtue of plaintiffs' status as detained arrestees, there are two categories under which the challenged strip searches might fall—searches incident to arrest or searches in detention facilities. The parties, by pleading and motion, have only disputed the law governing the latter category. The scope of searches incident to arrest remains relevant, however, for determining what is reasonable in the arrestee context.

In a quartet of cases, the Supreme Court discussed the extent of searches incident to lawful arrest. In United States v. Robinson, 414 U.S. 218 (1973), the Court held that a search incident to arrest would not be limited to a frisk for weapons but could include a "full search" of the person for both weapons and evidence. Id. at 227-30. The Robinson Court described the full search as a "relatively extensive exploration of the person." Id. at 227 (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)); see also id. at 221-23 (describing the search at issue in Robinson). In two subsequent cases, the Court clarified that clothing and possessions could also be searched incident to arrest. Illinois v. Lafayette, 462 U.S. 640, 646-47 (1983) (upholding an inventory search of an arrestee's personal property at the stationhouse); United States v. Edwards, 415 U.S. 800, 802-04 (1974) (upholding the confiscation of an arrestee's clothing as evidence at the stationhouse). In Lafayette, the Court clarified Edwards, stating "[w]e were not addressing in Edwards, and do not discuss here, the circumstances in which a strip search of an arrestee may or may not be appropriate." Lafayette, 462 U.S. at 645-46 & n.2. Finally, in Schmerber v. California, 384 U.S. 853 (1966), a case decided several years before Robinson, the Court ruled that the Fourth Amendment does not permit searches incident to arrest which involve "intrusions beyond the body's surface," such as the drawing of blood. Id. at 769. Instead, such searches must be based on probable cause and, absent exigent circumstances, a warrant. Id. at 770-71; see also Montoya de Hernandez, 473 U.S. at 540-41.

No Supreme Court case discusses the constitutionality of strip searches incident to arrest, which appear to fall between the "full searches" considered by Robinson and the "intrusions beyond the body's surface" considered by Schmerber. Nevertheless, several circuit courts have ruled that strip searches are not included in the category of permissible searches incident to arrest. Fuller v. M.G. Jewelry, 950 F.2d 1437, 1447-50 (9th Cir. 1991); Mary Beth G. v. City of

Chicago, 723 F.2d 1263, 1268-71 (7th Cir. 1984); cf Burns v. Loranger, 907 F.2d 233, 236 (1st

Cir. 1990). As this precedent demonstrates, plaintiffs' status as arrestees, standing alone, did not

provide a constitutional basis for the suspicionless strip searches alleged in the Amended

Complaint. Defendants argue, however, that plaintiffs' status as arrestees who were detained in a

custodial facility did provide such a basis.

### 2.      Fourth Amendment Rights in Custodial Facilities

Detention and incarceration necessarily require certain limitations on otherwise protected

civil liberties. Hudson v. Palmer, 468 U.S. 517, 524 (1984); Bell v. Wolfish, 441 U.S. 520, 545-

46 (1979). In custodial facilities, "[t]he curtailment of certain rights is necessary, as a practical

matter, to accommodate a myriad of 'institutional needs and objectives.'" Hudson, 468 U.S. at

524. For this reason, the Fourth Amendment rights of inmates are measured differently from

those enjoyed by persons who have not been lawfully detained or incarcerated. In fact, because

custodial facilities necessarily provide little in the way of personal privacy, Fourth Amendment

rights, which only exist where a person has a reasonable expectation of privacy that society is

willing to recognize, are significantly diminished in custodial settings. See Hudson, 468 U.S. at

525-28; Bell, 441 U.S. at 557.

Courts necessarily play a "limited role" in the administration of detention facilities. Block

v. Rutherford, 468 U.S. 576, 584-85 (1984). As the Bell Court recognized, a "detention facility is

a unique place fraught with serious security dangers." Bell, 441 U.S. at 559. Crafting policies

which both address the complex issues of a secure residential institution and resolve the day-to-

day problems of a high-risk population is a difficult managerial task and one to which courts are

ill-suited. Lewis v. Casey, 518 U.S. 343, 387 n.8 (1996); Thornburgh v. Abbott, 490 U.S. 401,

407-08 (1989) ("[T]he judiciary is 'ill equipped' to deal with the difficult and delicate problems

12

of prison management . . . ."). For this reason, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547-48 (noting not only that prison administrators have "a better grasp of [this] domain" than reviewing judges but also that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches").

In affording due deference to prison administrators, courts must not, however, abdicate their duty to protect individuals from government overreaching. "[P]risons are not beyond the reach of the Constitution," Hudson, 468 U.S. at 523, and courts must ensure that the actions and policies of prison officials do not deprive inmates of those constitutional rights that have been recognized to exist in custodial facilities. One such right is the Fourth Amendment protection from unreasonable custodial strip searches.

### 3.    Bell Standard for Custodial Strip Searches

In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court addressed the constitutionality of two types of searches conducted in custodial facilities: cell searches which inmates were not permitted to observe and strip searches following contact visits. For both searches, the Court assumed without deciding that "inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility." Id. at 557, 558. The Court upheld both searches as reasonable under the Fourth Amendment. Id. In reviewing the strip search policy, the Court provided the following Fourth Amendment standard. Noting that the Fourth Amendment prohibits "unreasonable searches" and that the "test of reasonableness . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," the Court proceeded to state four factors which courts

must consider: "[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." Id. at 559.

The Fourth Amendment standard that Bell articulated for custodial strip searches is not unique to Bell. The Court affirmed the same balancing approach that it had applied in other Fourth Amendment contexts. Delaware v. Prouse, 440 U.S. 648, 654 (1979). Further, the Court identified the relevant factors by reference to other cases which questioned the validity of routine, non-investigatory searches and seizures. See, e.g., Prouse, 440 U.S. 648 (striking down random, suspicionless car stops); United States v. Ramsey, 431 U.S. 606 (1977) (upholding suspicionless border searches generally and for international mail); United States v. Martinez-Fuerte, 428 U.S. 543 (1976) (upholding suspicionless car stops made at reasonably located, permanent checkpoints near the border); United States v. Brignoni-Ponce, 422 U.S. 873 (1975) (striking down suspicionless car stops by roving patrols near the border); Camara v. Mun. Ct. of S.F., 387 U.S. 523 (1967) (requiring "area" warrants for building code inspections, but upholding suspicionless searches of individual residences located within the area covered by warrant); Terry v. Ohio, 392 U.S. 1 (1968) (upholding limited "stop and frisk" procedure on less than probable cause, but requiring reasonable suspicion).

### B.    Defendant's Arguments that Bell No Longer Applies

Since Bell, most courts faced with challenges to the constitutionality of custodial strip searches have relied on the standard articulated in Bell. See, e.g., Powell v. Barrett, 541 F.3d 1298, 1302-03 (11th Cir. 2008) (en banc); Swain v. Spinney, 117 F.3d 1, 6 (1st Cir. 1997); Masters v. Crouch, 872 F.2d 1248, 1253 (6th Cir. 1989); Jones v. Edwards, 770 F.2d 739, 740 (8th Cir. 1985); Stewart v. Lubbock County, 767 F.2d 153, 156 (5th Cir. 1985); Hill v. Bogans, 735 F.2d 391, 393 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1271 (7th

14

Cir. 1983); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981). Nevertheless, defendant now

argues that two Supreme Court cases following Bell, Hudson v. Palmer, 468 U.S. 517 (1984),

and Turner v. Safley, 482 U.S. 78 (1987), have so undermined Bell's Fourth Amendment

approach to custodial strip searches that Bell no longer controls the adjudication of plaintiffs'

claims. For the reasons that follow, this Court rejects both of defendant's arguments.

> **1.     Inmates' Fourth Amendment Rights in Custodial Facilities Under
> Hudson v. Palmer**

The first question before the Court is whether persons who are detained or incarcerated in

custodial facilities enjoy the protection of the Fourth Amendment at all. For the contact visit strip

searches of pretrial detainees in Bell, the Supreme Court "assume[d without deciding] that

inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights

upon commitment to a corrections facility." Bell, 441 U.S. at 558. Five years later, in Hudson v.

Palmer, 468 U.S. 517, 526 (1984), the Court revisited the issue of inmates' Fourth Amendment

rights in the context of a cell search challenged by a convicted prisoner. The Hudson Court held

that "society is not prepared to recognize as legitimate any subjective expectation of privacy that

a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment

proscription against unreasonable searches does not apply within the confines of the prison cell."

Hudson, 468 U.S. at 526. Defendant relies on Hudson's broadest language to argue that the

Hudson holding effectively overrules Bell by rendering all Fourth Amendment claims by inmates

non-cognizable. Plaintiffs argue that Hudson is limited to cell searches and does not, therefore,

disturb Bell. The parties' arguments bring into focus the distinction between cell searches and

strip searches in custodial facilities.

In Hudson, the Court considered a cell search challenged by a convicted inmate and

questioned whether the inmate had a reasonable expectation of privacy in his cell which would

entitle him to Fourth Amendment rights. <u>Hudson</u>, 468 U.S. at 522. The Court concluded that the "recognition of privacy rights for prisoners in their *individual cells* simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." <u>Id.</u> at 526 (emphasis added). In reaching this conclusion, the <u>Hudson</u> Court cited <u>Bell</u> with approval and at no point overruled <u>Bell</u>'s holding or analysis. Moreover, <u>Hudson</u> does not stand alone. It is one of a pair of opinions issued the same day on the constitutionality of cell searches. In the other case, <u>Block v. Rutherford</u>, 468 U.S. 576 (1984), the Court considered a cell search challenged by a *pretrial detainee*. While <u>Hudson</u> does not mention <u>Bell</u>'s Fourth Amendment assumption, <u>Block</u> specifically affirms it with regard to pretrial detainee cell searches. Block, 468 U.S. at 586 (upholding Bell's conclusion that prison cell searches do not violate pretrial detainees' presumed Fourth Amendment rights).

The majority of circuit courts that have considered the relationship between <u>Hudson</u> and <u>Bell</u> have limited <u>Hudson</u> to cell searches and have held, either explicitly or implicitly, that <u>Hudson</u> did not disturb <u>Bell</u>'s Fourth Amendment approach to analyzing the constitutionality of strip searches conducted in custodial settings. <u>See</u> <u>Elliot v. Lynn</u>, 38 F.3d 188, 191 n.3 (5th Cir. 1994) (holding that inmates' Fourth Amendment protection from unreasonable strip searches survives <u>Hudson</u>); <u>Watsy v. Ames</u>, No. 87-1660, 1988 WL 24978, at *2 (6th Cir. 1988) (ruling <u>Hudson</u> inapplicable in a strip search case because it "dealt with the search of a cell as opposed to the search of an individual"); <u>Forbes v. Trigg</u>, 976 F.2d 308, 312 (7th Cir. 1992) (stating that "prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings" and citing <u>Hudson</u> and <u>Bell</u>); <u>Thompson v. Souza</u>, 111 F.3d 694, 699 (9th Cir. 1997) (holding that incarcerated prisoners have Fourth Amendment-protected privacy interests after <u>Hudson</u> and despite <u>Hudson</u>'s broad language); <u>Dunn v. White</u>, 880 F.2d 1188,

1191 (10th Cir. 1989) (holding that even after Hudson, "the prisoner's privacy interest in the

integrity of his own person is still preserved under [Bell]"); Covino v. Patrissi, 967 F.2d 73, 78

(2d Cir. 1992) ("While we acknowledge the clear teaching of the Supreme Court's holding in

Hudson with respect to prison spaces, we believe that maintenance of prison security is not

burdened unduly by the recognition that inmates do retain a limited right to bodily privacy."); see

also Kent v. Johnson, 821 F.2d 1220, 1226 (6th Cir. 1987) (limiting the Hudson holding to

prison cells and assessing whether plaintiff prisoner had a reasonable expectation of privacy with

regard to her person entitling her to Fourth Amendment protection); Bonitz v. Fair, 804 F.2d 164,

170 & n.6 (1st Cir. 1986), overruled on other grounds by Unwin v. Campbell, 863 F.2d 124 (1st

Cir. 1988) (applying Bell's Fourth Amendment analysis to a strip search but denying plaintiff's

cell search claim under Hudson); Nicholas v. Goord, 430 F.3d 652, 675-76 (2d Cir. 2005)

(recognizing the distinction between Hudson which denied the availability of Fourth Amendment

rights as applied to cell searches and Bell which held that the strip searches after contact visits in

that case did not violate the Fourth Amendment). But see Johnson v. Phelan, 69 F.3d 144, 146

(7th Cir. 1995) (holding that Hudson overruled Bell's assumption and abrogated convicted

prisoners' Fourth Amendment rights);[6] Jones v. Murray, 962 F.2d 302, 306 (4th Cir. 1992)

(erroneously attributing to Bell the holding that "persons lawfully arrested on probable cause and

detained lose a right of privacy from routine searches of the cavities of their bodies").[7]

---

[6] Eight years after Phelan, the Seventh Circuit applied Bell's Fourth Amendment analysis
to a custodial search during which an arrestee was required to strip down to her undergarments
while under the observation of an officer. Stanley v. Henson, 337 F.3d 961, 964-67 (7th Cir.
2003). Stanley cited Phelan for the principle that "[o]bservation is a form of search," but did not
reference Phelan's Hudson-Bell holding. Stanley, 337 F.3d at 694 (citing Phelan, 69 F.3d at 145).

[7] The Eighth, Third, and D.C. Circuits have not addressed the relationship between Bell
and Hudson.

Although none of the cases cited above explain the Bell-Hudson relationship in much detail, the vast majority clearly distinguish Hudson from Bell and support the continuing validity of Bell with regard to the constitutionality of custodial strip searches. This Court agrees with that distinction. Strip searches of the body, such as those at issue in Bell, inflict a much greater invasion of privacy than searches of prison cells. This fact suggests that the Hudson Court would not overrule, *sub silentio*, Bell's implied assumption that pretrial detainees have a reasonable expectation of privacy with regard to their own bodies. Although the Supreme Court's Bell holding is based on an assumption that the Fourth Amendment governs strip searches in custodial facilities, that assumption survives Hudson and controls the Court's review of plaintiffs' claims.

In reaching this conclusion, the Court is particularly mindful of the Supreme Court's caution in approaching claims that the Fourth Amendment is inapplicable in a given context, Hudson, 468 U.S. at 525, and of the Supreme Court's admonition that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson / Am. Express, Inc., 490 U.S. 477, 484 (1989); accord Hohn v. United States, 524 U.S. 236, 252-53 (1998); Agostini v. Felton, 521 U.S. 203, 237 (1997). In light of the foregoing, this Court rejects defendant's argument that plaintiffs' claims should be dismissed on the ground that Hudson deprives inmates of Fourth Amendment rights.

### 2.    The Turner v. Safley Standard of Review for Prison Regulations

Defendant next argues that this Court should employ the standard articulated in Turner v. Safely, 482 U.S. 78, 89-91 (1987), for assessing the constitutionality of prison regulations generally, instead of the more specific Fourth Amendment test that Bell applied to strip searches.

According to the <u>Turner</u> standard, defendant's strip search policy would be constitutional as long as "it is reasonably related to legitimate penological interests." <u>Turner</u>, 482 U.S. at 89. The Supreme Court elaborated on the standard by enumerating four relevant factors: "whether the regulation has a valid, rational connection to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are ready alternatives to the regulation." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003) (citing <u>Turner</u>, 482 U.S. at 89-91) (internal quotations omitted).

The <u>Turner</u> plaintiffs, inmates of a correctional institution in Missouri, challenged certain prison regulations under the First and Fourteenth Amendments of the United States Constitution. <u>Turner</u>, 482 U.S. at 81. The district court and the court of appeals applied a strict scrutiny standard to plaintiffs' claims and held the regulations unconstitutional. <u>Id.</u> at 83. The "task" facing the Supreme Court was "to formulate a standard of review for prisoners' constitutional claims." <u>Id.</u> at 85. The Supreme Court, rejecting the appropriateness of strict scrutiny for reviewing the constitutionality of prison regulations, reversed the lower court holdings and substituted the modified rational basis standard quoted above. <u>Id.</u> at 81, 89-91.

<u>Turner</u>, and the Supreme Court cases which apply <u>Turner</u>, concern First and Fourteenth Amendment challenges to prison regulations, not Fourth Amendment challenges. <u>Overton v. Bazzetta</u>, 539 U.S. 126 (2003); <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342 (1987); <u>Washington v. Harper</u>, 494 U.S. 210 (1990); <u>Turner</u>, 482 U.S. 78. Indeed, the standards of review discussed in <u>Turner</u> have never had any application in the Fourth Amendment context because the Fourth

Amendment mandates a different standard—reasonableness.[8]

Although a number of courts, including most courts of appeals, have ruled on the constitutionality of strip searches in custodial facilities, defendant has cited no case which applies the Turner test instead of the Bell test in circumstances similar to those at bar involving arrestees. In fact, only two courts of appeals, the Second and Ninth Circuits, have even addressed Turner's applicability to custodial strip search cases. This Court is not persuaded by the analysis of those circuits.

The Ninth Circuit, in Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988), stated that Turner "set forth the standard for reviewing alleged infringements of prisoners' constitutional rights," id. at 331, and purportedly applied that standard to the plaintiff's claim that he was unconstitutionally strip searched at the Nevada state prison. The Michenfelder court's analysis, however, relied almost exclusively on the balancing test set forth in Bell. Id. at 331-33. After evaluating the reasonableness of the prison's strip search policy with regard to each of Bell's four factors, the court concluded by invoking the language of the Turner test. Id. at 333 (affirming the district court's finding that the prison's "strip search policy was reasonably related to legitimate penological interests"). Subsequent Ninth Circuit cases have continued Michenfelder's practice of applying Bell through Turner to strip searches in prisons. See Thompson v. Souza, 111 F.3d 694 (9th Cir. 1997);  Cuffle v. Agnos, No. 93-16842, 1994 WL 245935 (9th Cir. 1994); Thompson v. City of Los Angeles, 885 F.2d 1439 (9th Cir. 1989). The Michenfelder approach has not been adopted by other courts of appeals and, in any case, does not support the more deferential review that defendant seeks by arguing for the application of Turner in this case.

_____

[8] This Court is not aware of any Supreme Court opinions which even mention standards of review, such as strict scrutiny or rational basis, when ruling on Fourth Amendment challenges, much less any cases which actually apply such a standard to a Fourth Amendment challenge.

The Second Circuit applies both Bell and Turner to claims involving custodial strip searches but differentiates based on the type of facility. It restricts Turner to cases involving prison regulations, Iqbal v. Hasty, 490 F.3d 143, 171-72 (2d Cir. 2007), and analyzes strip search policies in jails using the Bell balancing test, Shain v. Ellison, 273 F.3d 56, 65-66 (2d Cir. 2001).[9] The Second Circuit developed the distinction between "prisons" and "jails" to reconcile its own prior treatment of custodial strip search cases, and it provides little support for defendant's argument that this Court should apply Turner in the instant case. See Iqbal, 490 F.3d at 172; Shain v. Ellison, 273 F.3d at 65-66. Indeed, other Second Circuit cases express doubt as to the appropriateness of the Turner test for evaluating Fourth Amendment claims and claims by pretrial detainees, regardless of the type of facility. N.G. v. Connecticut, 382 F3d 225, 235 (2d Cir. 2004) ("[T]here is some basis for doubting that the Turner standard applies to a claim of constitutional protection *from* state action such as a strip search. Turner concerned prisoners' assertion of affirmative rights [under the First and Fourteenth Amendments]."); Benjamin v. Frazer, 264 F.3d 175, 187 n.10 (2d Cir. 2001) (questioning whether Turner's focus on "penological interests" provides an "appropriate guide" for assessing constitutional claims by pretrial detainees). The Second Circuit decisions on this issue do not persuade this Court to apply Turner to the facts at bar.

Ultimately, defendant's Turner argument fails for the same reason that defendant's Hudson argument failed. Like Hudson, Turner cited Bell with approval and did not at any point

---

[9] The Second Circuit uses Black's Law Dictionary to define "prisons" and "jails": "A prison is '[a] state or federal facility of confinement for convicted criminals, esp[ecially] felons.' A jail, on the other hand, is '[a] place where persons awaiting trial or those convicted of misdemeanors are confined.'" Shain v. Ellison, 273 F.3d at 65 (internal citations omitted); see also Iqbal v. Hasty, 490 F.3d at 172 (concluding that the Metropolitan Detention Center in Brooklyn, NY was "most like a prison" because the plaintiff "was confined for an extended period of time in a prison-like environment" and was apparently "charged with felonies").

suggest that <u>Bell</u>'s approach to Fourth Amendment claims should no longer be controlling law. <u>Turner</u>, 482 U.S. at 87 (citing to the portions of <u>Bell</u> which discussed petitioners' First Amendment claims). This Court will not disregard controlling Supreme Court precedent that has not been specifically overruled by subsequent Supreme Court cases. <u>See</u> <u>Powell</u>, 541 F.3d at 1302 (declining to apply the <u>Turner</u> test to custodial strip searches on this ground); <u>cf</u> <u>Johnson v. California</u>, 543 U.S. 499, 509-10 (2005) (holding that <u>Turner</u> did not "cast doubt on" the Court's previous holding that strict scrutiny applies to racial classifications in prisons). Like the many courts that have addressed the constitutionality of custodial strip searches, this Court is guided by <u>Bell</u> and its progeny.

### C.  The Constitutionality of Suspicionless Arrestee Strip Searches in Custodial Facilities

Having determined that <u>Bell</u>'s Fourth Amendment standard is the appropriate test by which to measure the viability of plaintiffs' claims, the Court now turns to the constitutionality of suspicionless arrestee strip searches under that standard. Prior to the issuance of <u>Powell v. Barrett</u>, 541 F.3d 1298 (11th Cir. 2008) (en banc), the numerous opinions of nine other circuit courts clearly established that the Fourth Amendment prohibits suspicionless arrestee strip searches. See, e.g., Chapman v. Nichols, 989 F.2d 393, 397-99 (10th Cir. 1993) (rejecting defendant's qualified immunity claim); Masters v. Couch, 872 F.2d 1248, 1257 (6th Cir. 1989) (same); Weber v. Dell, 804 F.2d 796, 803-04 (2d Cir. 1986) (same); Jones v. Edwards, 770 F.2d 739, 742 n.4 (8th Cir. 1985) (same). The consensus was that arrestee strip searches in custodial facilities must be based on reasonable suspicion. <u>See, e.g.</u>, Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984) (per curiam), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999). Dismissing the virtually unanimous circuit precedent on this issue, the Eleventh Circuit, in <u>Powell</u>, ruled that

suspicionless arrestee strip searches do not violate the Fourth Amendment and that all opinions to the contrary misread <u>Bell</u>. <u>Powell</u>, 541 F.3d at 1302, 1306-1307. Defendant now argues that this Court should "join <u>Powell</u> in standing against [the] litany of incorrectly[ ]decided cases." (Def. Reply at 10.)

After conducting a thorough review of <u>Bell</u>, the circuit court cases following <u>Bell</u>, and <u>Powell</u>, this Court is unconvinced by the reasoning of the Eleventh Circuit and rejects defendant's argument that plaintiffs have failed to state a claim under <u>Bell</u> and its progeny. To fully explain its rejection of the <u>Powell</u> opinion, this Court must describe, at some length, the Supreme Court's holding in <u>Bell</u> and the reasoning of the circuit opinions which followed <u>Bell</u>.

### 1.    The Constitutionality of *Contact Visit* Strip Searches Under <u>Bell v. Wolfish</u>

The <u>Bell</u> opinion primarily concerns the Due Process right "to be free from punishment" during pretrial detention and the Supreme Court's assessment of whether particular prison practices constitute punishment. <u>Bell</u>, 441 U.S. at 534. In addition, however, the Supreme Court ruled on practices that were alleged to violate various express guarantees of the Constitution, including the practice of strip searching all pretrial detainees after contact visits which was alleged to violate the Fourth Amendment. The Supreme Court's analysis of the challenged strip search policy, a subject of significant controversy after <u>Powell</u>, is outlined below. The important questions, for present purposes, are (1) whether the Court approved suspicionless searches or required some level of individualized suspicion and (2) whether the Court's holding applies to all custodial strip search policies and not just the contact visit strip search policy at issue in <u>Bell</u>.

<u>Bell</u> began as a class action petition[10] which challenged certain conditions of confinement

---

[10] The petitioners filed a petition for a writ for habeas corpus that was later certified as a class action. Despite this unusual procedural posture, the Supreme Court addressed petitioners'

at the Metropolitan Correctional Center (MCC), a custodial facility in New York City. Bell, 441 U.S. at 523. The Bell petitioners were federal pretrial detainees who had been detained pursuant to a determination by a federal judge that no less drastic means could reasonably ensure their presence at trial. Id. at 524 (citing the Bail Reform Act of 1966, Pub. L. No. 89-465, § 3, 80 Stat. 214, 214). The MCC also housed convicted prisoners, persons in protective custody, and persons incarcerated for contempt, but they were not parties to the Supreme Court proceeding. Id. at 524, 529-30.  The petition "served up a veritable potpourri of complaints that implicated virtually every facet of the institution's conditions and practices," including the MCC's policy and practice of strip searching inmates after each contact visit. Id. at 527-28, 558. These searches involved both the removal of all clothing and the visual inspection of body cavities. Id. at 558 & n.39

At trial on the constitutionality of the MCC's contact visit strip searches, the district court approved the blanket policy with regard to the observation of inmates' naked bodies but held that it was unconstitutional to the extent that it authorized visual body cavity searches absent probable cause to believe that the inmate was concealing contraband. United States ex rel. Wolfish v. Levi, 439 F. Supp. 114, 148 (S.D.N.Y. 1977). The Second Circuit affirmed. Wolfish v. Levi, 573 F.2d 118, 131 (2d Cir. 1978). Consequently, the question before the Supreme Court was "whether visual body-cavity inspections as contemplated by the MCC rules [for contact visit strip searches] can *ever* be conducted on less than probable cause." Bell, 441 at 560 (emphasis in original). The Court answered that question in the affirmative, holding that the MCC's blanket policy of searching all inmates after contact visits was reasonable.

---

claims on the merits. Bell, 441 U.S. at 526 & nn.5-6 ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement . . . .").

The Court began its analysis of the strip search issue by admitting that "this practice instinctively gives us the most pause." Bell, 441 U.S. at 558. The Court then proceeded to assess the reasonableness of the challenged search policy by balancing "the need for the particular search against the invasion of personal rights that the search entail[ed]." Id. at 559. The Court considered "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. As discussed in Part IV.A of this Memorandum, the above standard is a version of the test that the Supreme Court has developed for assessing the reasonableness of "special needs" searches—those which can be conducted without the Fourth Amendment's default requirement of individualized suspicion.

With regard to the scope of the intrusion, the Bell Court described the searches as follows: "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected. The inmate is not touched by security personnel at any time during the *visual* search procedure." Bell, 441 U.S. at 558 n.39 (emphasis in original). The Court stated that it did "not underestimate the degree to which these searches may invade the personal privacy of inmates" and quoted the Second Circuit's view that such searches represent a "'gross violation of personal privacy.'" Id. at 558, 560 (quoting Wolfish v. Levi, 573 F.2d 118, 131 (2d Cir. 1978)). With regard to the manner of the searches, the Court observed that the district court had found some evidence of abuse. Id. at 560. Declaring that "[s]uch an abuse cannot be condoned," the Court restricted its review to searches conducted in an appropriate manner pursuant to the MCC policy. Id.

On the other side of the equation were the needs of the institution. The Court characterized detention facilities as "unique place[s] fraught with serious security dangers" and described the risks posed by the smuggling of money, drugs, and weapons. Bell, 441 U.S. at 559.

25

Corrections officials justified the searches by stating that they were necessary both to detect contraband exchanged and concealed during contact visits and to deter the smuggling of contraband during contact visits. Id. at 558. At trial, the evidence showed that the MCC strip searches had successfully detected contraband only once, but the Court found this evidence inconclusive because it could "be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." Id. at 559.

Despite the highly intrusive nature of the searches, the Court found that the inmates' privacy interests were outweighed by the "significant and legitimate security interests of the institution" and upheld the MCC's contact visit strip search policy as reasonable. Bell, 441 U.S. at 558, 560. In upholding a blanket policy, the Court concluded that custodial strip searches could "be conducted on less than probable cause" and, indeed, that they could be conducted without any individualized assessment of cause. Id. at 560. Essentially, the Court placed the MCC's contact visit strip searches in the "closely guarded category of constitutionally permissible suspicionless searches," Chandler, 520 U.S. at 309, which are reasonable based on the government needs at stake and not because the government has cause for each individual search. Because the Court determined that the blanket policy was reasonable on the facts before it, it had no occasion to rule on what factual circumstances might make a custodial strip search policy unreasonable. It also had no reason to require a particular level of individualized suspicion—reasonable suspicion or probable cause—in order to uphold custodial strip searches that would be unreasonable if suspicionless.

### 2. Circuit Court Rulings on *Arrestee* Strip Searches in Custodial Facilities

By the time the Eleventh Circuit decided Powell, nine other circuits had applied the Bell

standard in cases involving recently arrested persons who were subjected to suspicionless strip

searches upon admission to a custodial facility and ruled that such searches were

unconstitutional. Powell correctly notes that while these decisions "vary in detail around the

edges, the picture they paint is essentially the same." Powell, 541 F.3d at 1309. In each case, a

person is arrested on charges which do not involve narcotics or violence. In some cases, the

charges were relatively minor. See, e.g., Walsh v. Franco, 849 F.2d 66, 67 (2d Cir. 1988) (failure

to pay parking tickets); Stewart v. Lubbock County, 767 F.2d 153, 154 n.1 (5th Cir. 1985)

(public intoxication and issuance of a bad check); Jones v. Edwards, 770 F.2d 739, 740 (8th Cir.

1985) (leash law violation). In other cases, the charges were more serious. See, e.g., Logan v.

Shealy, 660 F.2d 1007, 1009 (4th Cir. 1981) (DUI); Kennedy v. Los Angeles Police Dep't, 901

F.2d 702, 704 (9th Cir. 1990), overruled on other grounds by Hunter v. Bryant, 502 U.S. 224

(1991) (grand theft). After arrest, the person is taken to a police station, jail, or other detention

facility. At that facility, the person is strip searched as part of the intake or admission process.

The scope of the strip searches varied. See, e.g., Hill v. Bogans, 735 F.2d 391, 393 (10th Cir.

1984) (arrestee instructed to drop pants and shorts); Giles v. Ackerman, 746 F.2d 614, 615 (9th

Cir. 1984) (per curiam), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d

1037 (9th Cir. 1999) (visual observation of arrestee's naked body); Mary Beth G. v. City of

Chicago, 723 F.2d 1263, 1266-67 (7th Cir. 1984) (visual body cavity inspection). Soon

thereafter, the person is released.

　　　　Although it is difficult to precisely characterize the collective holdings of these cases,

especially considering the fact-sensitive nature of reasonableness analysis, suffice it to say that all

nine circuits found suspicionless strip searches of recently arrested persons unreasonable and

therefore unconstitutional. Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997); Masters v. Crouch,

872 F.2d 1248, 1255 (6th Cir. 1989); Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986); Jones v.

Edwards, 770 F.2d at 741-42; Stewart, 767 F.2d at 156-57; Giles v. Ackerman, 746 F.2d at 617;

Hill v. Bogans, 735 F.2d at 394-95; Mary Beth G., 723 F.2d at 1273; Logan v. Shealy, 660 F.2d

at 1013.[11] These courts held that, to be reasonable, custodial strip searches of detained arrestees

must be predicated on reasonable suspicion. The "[r]easonable suspicion may be based on such

factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest

record." Giles v. Ackerman, 746 F.2d at 617.

 In none of the cases cited above did the court determine that Bell's reasonableness ruling

with regard to the MCC's contact visit strip searches controlled the reasonableness of custodial

strip searches in other contexts. Rather, each court recited Bell's Fourth Amendment standard

and then proceeded to apply that standard to the facts before it. In balancing "the need for the

particular search against the invasion of rights that the search entails," courts considered the

factors identified by Bell ("the scope of the particular intrusion, the manner in which it is

conducted, the justification for initiating it, and the place in which it is conducted") and

considered the Bell Court's analysis of those factors. Bell, 441 U.S. at 559. From the ample

---

[11] Most circuits have also affirmed the holdings of the above-cited cases in subsequent opinions. As the Court noted in the Introduction, the Third Circuit has not ruled on the constitutionality of custodial arrestee strip searches. Several district courts in the Third Circuit have ruled on this issue, however. Those opinions also hold that suspicionless custodial strip searches of detained arrestees violate the Fourth Amendment. Florence v. Bd. of Chosen Freeholders of Burlington, No. 05-3619, 2009 WL 252174, at *16 (D.N.J. Feb. 4, 2009); Martinez v. Warner, No. 07-3213, 2008 WL 2331957, at *14-15 (E.D. Pa. June 5, 2008); Newkirk v. Sheers, 834 F. Supp. 772, 789-90 (E.D. Pa. 1993); Ernst v. Borough of Fort Lee, 739 F. Supp. 220, 224 (D.N.J. 1990); O'Brien v. Borough of Woodbury Heights, 679 F. Supp. 429, 434 (D.N.J. 1988); Davis v. City of Camden, 657 F. Supp. 396, 401 (D.N.J. 1987). In addition, this Court has previously ruled, based on then-prevailing precedent, that blanket strip search policies violate detained arrestees' Fourth Amendment rights. Flythe v. Darby Borough, No. 05-5715, 2006 WL 2504023, at *9 (E.D. Pa. Aug. 25, 2006) (citing Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986), Ward v. County of San Diego, 791 F.2d 1329, 1333 (9th Cir. 1986); Mary Beth G. v. Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983)).

authority provided by numerous circuit courts, this Court draws the following conclusions.

### a.      The Invasion of Rights that the Search Entails

In Bell, the contact visit strip searches involved visual body cavity inspection. Subsequent

cases have noted that strip searches, regardless of the particular procedures used,[12] constitute

extremely invasive government action. Giles v. Ackerman, 746 F.2d at 617 (stating that a skin

search invaded plaintiff's privacy "in a frightening and humiliating manner"); Logan v. Shealy,

660 F.2d at 1013 (describing a visual strip search as "the ultimate invasion of personal rights");

Thompson v. City of Los Angeles, 885 F.2d 1439, 1446 (9th Cir. 1989) ("The feelings of

humiliation and degradation associated with forcibly exposing one's nude body to strangers for

visual inspection is beyond dispute."). Because a more invasive strip search can be "demeaning,

dehumanizing, undignified, humiliating, [and] repulsive," it constitutes "one of the most grievous

offenses against personal dignity and common decency." Bell, 441 U.S. at 576-77 (Marshall, J.,

dissenting); accord Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983).

Strip searches are more intrusive than searches of arrestees incident to arrest. See Mary

Beth G., 723 F.2d at 1268-71; Swain v. Spinney, 117 F.3d 1, 5-6 (1st Cir. 1997); Giles v.

Ackerman, 746 F.2d at 616. Strip searches are also considerably more intrusive than "the limited

---

[12] The term "strip search" generically refers to a variety of searches and search techniques which vary in scope. See N.G. v. Connecticut, 382 F.3d 225, 228 n.4 (2d Cir. 2004) ("'Strip search' is often used as an umbrella term that applies to all inspections of naked individuals."); see, e.g., Giles v. Ackerman, 746 F.2d at 615-16 (describing a "skin search" which involved the removal of clothes and visual inspection of the naked body); Mary Beth G., 723 F.2d at 1267 (describing a "visual body cavity inspection" similar to the one at issue in Bell); Spear v. Sowders, 71 F.3d 626, 629 (6th Cir. 1995) (describing a "manual body cavity search," during which officers probed the subject's vagina and anus). Some practices, such as observing a subject during a clothing exchange procedure, instructing a subject to squat and cough while naked, or instructing a subject to insert his or her own fingers into a body cavity, do not fit neatly into one category or another. In general, however, the precise category of the search is less important than the invasiveness of the techniques employed during the search. Stanley v. Henson, 337 F.3d 961, 964 & n.2 (7th Cir. 2003).

search of the outer clothing for weapons" authorized by Terry v. Ohio on an officer's reasonable suspicion, which the Supreme Court described as "a severe, though brief, intrusion upon cherished personal security, [which] must surely be an annoying, frightening, and perhaps humiliating experience." Terry v. Ohio, 392 U.S. 1, 24-25 (1968).

Strip searches differ qualitatively from other intake procedures which entail some incidental nudity but do not involve visual inspection of the naked body. Cf Stanley v. Henson, 337 F.3d 961, 967 (7th Cir. 2003) (upholding a clothing exchange procedure and distinguishing the "relatively narrow intrusion" of the procedure from the more intrusive strip searches described in the cases following Bell); Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 62-64 (1st Cir. 2003) (defining a strip search as involving "visual inspection" of the naked body for the purpose of determining whether the jail's clothing exchange and shower procedure amounted to a strip search). The exposure of the naked body to scrutiny by government officers is what makes strip searches more invasive than other admission procedures at a custodial facility.

The intrusiveness of the search must also be considered in light of the circumstances and context of the search. For offenses that are relatively minor, a strip search represents a grossly disproportionate consequence of arrest. Few people would think that their right of privacy in their own body, a "cherished value of our society," Schmerber, 384 U.S. at 772, could be jeopardized by the failure to pay parking tickets, shoplifting, or driving without a license. Police officers arrest and temporarily detain individuals for offenses that carry minimal statutory penalties. See, e.g., Stewart, 767 F.2d at 154-55; Hill v. Bogans, 735 F.2d 391, 392-93 (10th Cir. 1984). Under a blanket policy, custodial facilities search all of these arrestees without regard to the severity of

their offenses or likelihood of conviction.[13] For minor offenders unfamiliar with the incidents of

detention, strip searches add shock and unexpected humiliation to the already frightening

experience of arrest.

### b.        The Need for the Particular Search

In Bell, the Court identified two reasons why the contact visit strip search policy at issue

in that case which involved visual body cavity inspection advanced the defendants' institutional

security interests. First, the policy enabled prison officers to discover contraband smuggled

during contact visits, and second, the blanket policy deterred the smuggling of contraband during

contact visits. Bell, 441 U.S. at 559. Courts that strike down blanket strip search policies for

detained arrestees conclude that the two justifications which supported the constitutionality of the

MCC policy for contact visit strip searches are lacking in the arrestee context. See Giles v.

Ackerman, 746 F.2d at 617 ("In contrast [to Bell], the County has not demonstrated that its

security interests warrant the serious invasion of privacy inflicted by its policy.").

Because arrest and detention are generally "unplanned events," most arrestees have little

opportunity to plan or carry out smuggling activities. See Giles v. Ackerman, 746 F.2d at 617;

accord Shain v. Ellison, 273 F.3d 56, 64 (2d Cir. 2001). Moreover, any possession of contraband

---

[13] This concept of disproportionality is not foreign to Fourth Amendment analysis. "The logic of distinguishing between minor and serious offenses in evaluating the reasonableness of . . . searches is almost too clear for argument." New Jersey v. T.L.O., 469 U.S. 325, 380 (1985) (Stevens, J., concurring & dissenting) (discussing the scope of school searches); cf Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) ("[A] finding of exigent circumstances to justify a warrantless home entry should be severely restricted when only a minor offense has been committed . . . ."); McDonald v. United States, 335 U.S. 451, 459 (1948) (Jackson, J., concurring) ("It is to me a shocking proposition that private homes . . . may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it."); but cf. United States v. Robinson, 414 U.S. 218, 234-35 (1973) (finding an arrestee's charges to be irrelevant to the blanket constitutionality of searches incident to arrest).

would, in all likelihood, be discovered during a valid search incident to arrest or a less intrusive custodial search. See Roberts v. Rhode Island, 239 F.3d 107, 112 (1st Cir. 2001) ("[L]ess invasive (and less constitutionally problematic) searches would have been equally effective in revealing contraband [possessed by detained arrestees]."); Chapman v. Nichols, 989 F.2d 393, 397 (10th Cir. 1993) ("[J]ails can meet the minimal security concerns they may have with minor offenders by means of a less intrusive pat-down search." (internal quotation marks and citations omitted)).

For offenses that are not commonly associated with the possession of weapons, drugs, or other contraband, the risk that an arrestee has secreted contraband in such a way that it could only be detected by a strip search shrinks further. Shain v. Ellison, 273 F.3d at 64 ("Bell authorized strip searches after contact visits, where contraband is often passed. It is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices." (internal citation omitted)); Jones v. Edwards, 770 F.2d at 741. For this reason, conducting routine strip searches on persons who are not arrested for offenses associated with contraband, have never been arrested on any such charges, and who are not carrying any contraband at the time of the arrest bears "no . . . discernible relationship to security needs" of custodial facilities. Logan v. Shealy, 660 F.2d at 1013; accord Mary Beth G., 723 F.2d at 1273 ("While the need to assure jail security is a legitimate and substantial concern, we believe that, [in the absence of evidence that the plaintiffs posed a security risk], the strip searches bore an insubstantial relationship to security needs . . . ."). Strip searching arrestees who are unlikely to possess, much less conceal, contraband does not serve the institutional security needs of a custodial facility.

The second Bell justification—deterrence—figured prominently in the Supreme Court's determination that the MCC's blanket policy was reasonable. The district court struck down the

MCC policy with regard to visual body cavity searches because it concluded that "giving full weight to [the deterrence] factor, . . . it cannot justify the more extreme and offensive aspects of the strip search." United States ex rel. Wolfish v. Levi, 439 F. Supp. 114, 147 (S.D.N.Y. 1977). The circuit court upheld the district court's decision because "only one instance in the MCC's several years of existence when contraband was found during a body cavity inspection." Wolfish v. Levi, 573 F.2d 118, 131 (2d Cir. 1978). The validity of deterrence as a justification for the strip search policy was, therefore, squarely before the Supreme Court. In upholding the MCC policy in its entirety, the Supreme Court relied on the government's claim that the policy served as a deterrent and used that argument to explain the fact that the MCC strip searches after contact visits had uncovered only one incident of attempted smuggling. Bell, 441 U.S. at 559.

In the arrestee context, a blanket strip search policy serves little deterrent function. "[T]he deterrent rationale for the Bell [contact visit] search is simply less relevant given the essentially unplanned nature of an arrest and subsequent incarceration." Roberts, 239 F.3d at 111. The inmates in Bell planned their contact visits and were aware that under the MCC's policy they would be strip searched after their contact visits. Arrest and detention, on the other hand, generally offer little opportunity for the kind of advance planning that might be influenced by deterrent measures. Giles v. Ackerman, 746 F.2d at 617. Further, for those arrestees who have no advance notice of a custodial facility's strip search policy, the deterrent effect shrinks to zero. Mary Beth G., 723 F.2d at 1272 n.8 ("No deterrence effect could have resulted from the strip search policy . . . because none of the [arrestees] were aware that such a policy even existed."). These considerations significantly weaken the effectiveness of a blanket arrestee strip search policy and, therefore, a custodial facility's justification for enforcing it.

### c.      Reasonableness and Reasonable Suspicion Standard

Balancing the justifications advanced by custodial facilities against the intrusion on

privacy interests inherent in strip searches, the courts cited above concluded that suspicionless

arrestee strip searches, either pursuant to a blanket policy or conducted individually, violate the

Fourth Amendment. In reaching this conclusion, these courts did not underestimate the

significant institutional security concerns of custodial facilities or overstep the deference owed to

prison officials. Even with those weighty considerations, the courts found that blanket policies

which allow indiscriminate searches of arrestees simply do not satisfy the basic Fourth

Amendment requirement of reasonableness because they subject too many people to highly

invasive, humiliating searches that do not actually promote the institutional security interests of

the custodial facility.

The individualized standard that courts have imposed after striking down blanket policies

or suspicionless searches—reasonable suspicion which can be based on "the crime charged, the

particular characteristics of the arrestee, and/or the circumstances of the arrest"—is a relatively

low burden in the Fourth Amendment context. Weber v. Dell, 804 F.2d at 802; see Kennedy v.

Los Angeles Police Dep't, 901 F.2d 702, 714-15 (9th Cir. 1990), overruled on other grounds by

Hunter v. Bryant, 502 U.S. 224 (1991). Because custodial facilities do face serious security risks

and officials' efforts to manage such facilities deserve deference, courts have not required that

custodial strip searches of detained arrestees be based on probable cause. The standard developed

in this context thus represents a "'mutual accommodation between institutional needs and

objectives and the provisions of the Constitution that are of general application.'" Bell, 441 U.S.

at 546 (quoting Wolff v. McDonnell, 418 U.S. 539, 556 (1974)).

Because a search may be justified by an arrestee's current or prior charges, the reasonable

suspicion standard developed in this context allows officials to take a more categorical approach to custodial strip searches. Roberts, 239 F.3d at 112 ("[C]ourts have given prisons latitude to premise searches on the type of crime for which an inmate is convicted or arrested."); see Dobrowolskyj v. Jefferson County, 823 F.2d 955, 958-58 (6th Cir. 1987) (upholding custodial strip search for person arrested on menacing charge); but see Watt v. Richardson Police Dep't, 849 F.2d 195, 198-99 (5th Cir. 1988) (concluding that even a charge-specific strip search policy cannot be applied mechanically). And, in reviewing custodial strip searches of detained arrestees on a case-by-case basis, courts continue to give officials the deference that Bell requires. Thompson v. City of Los Angeles, 885 F.2d 1439, 1447 (9th Cir. 1989) ("[O]n balance, [grand theft auto] is sufficiently associated with violence to justify a visual strip search."); Wachtler v. County of Herkimer, 35 F.3d 77, 81 (2d Cir. 1994) (granting qualified immunity because "we cannot say on the somewhat unique facts before us[—arrest based on plaintiff's failure to produce ID when stopped for speeding—]that it is clearly established that no 'reasonable suspicion' justified a strip-search in this case").

Defendant does not argue that plaintiffs have failed to state a claim under this precedent. Instead, defendant argues that the Court should follow Powell and disregard the foregoing authority in its entirety. On this front, defendant's arguments fail.

### 3.    Powell v. Barrett and Defendant's Powell-Based Arguments

Powell began as a putative class action by eleven former inmates of the Fulton County Jail in Georgia ("FCJ"), all of whom were strip searched pursuant to the FCJ's blanket policy of strip searching inmates entering or reentering the general prison population. Powell v. Barrett,

541 F.3d 1298, 1300 (11th Cir. 2008) (en banc).[14] The proposed class was divided into three

groups, only one of which was before the *en banc* court. This group consisted of recent arrestees

who were strip searched upon admission to the FCJ and before placement in the FCJ's general

population.[15] Id. At the motion to dismiss stage, the district court ruled that defendants were

entitled to qualified immunity. Powell v. Barrett, 376 F. Supp. 2d 1340, 1350 (N.D. Ga. 2005).

Assuming that the plaintiffs had sufficiently alleged a Fourth Amendment cause of action, the

district court nevertheless found that the unconstitutionality of the blanket strip search policy was

not clearly established. Id. at 1346 n.3, 1349-50. Noting that "defendants' motions [to dismiss]

involve[d] several controlling questions of law with respect to which there is substantial ground

for difference of opinion," the district court certified the issues raised in defendants' motions for

immediate interlocutory appeal. Order, Powell v. Barrett, No. 04-cv-1100 (N.D. Ga. Aug. 15,

2005).

On interlocutory appeal, the Eleventh Circuit panel reversed the district court's qualified

immunity ruling. Following the binding precedent of earlier Eleventh Circuit opinions, the panel

concluded both that "the Jail's alleged policy of conducting blanket strip searches on all arrestees

at booking, on the single ground that they are to be placed in the Jail's general population, must

be deemed unconstitutional" and that the unconstitutionality of the policy was clearly

---

[14] Citations to "Powell" in this Part of the Memorandum, as in other Parts, refer to the Eleventh Circuit's *en banc* opinion, and not to the lower court opinion or the Eleventh Circuit's panel opinion.

[15] The other two groups included detainees who were strip searched before being released from the FCJ, either after initial bail hearings or after court appearances. After ruling on the constitutionality of the point-of-entry strip searches conducted on arrestees being placed in the general population, the Eleventh Circuit remanded the case to the panel to apply the principles discussed in the *en banc* opinion to the other two groups. Powell, 541 F.3d at 1314. The panel remanded the case to the district court for further factual development. Powell v. Barrett, No. 05-16734, 2009 WL 117586, at *2 (11th Cir. Jan. 20, 2009).

established. Powell v. Barrett, 496 F.3d 1288, 1310-13, 1315-17 (11th Cir. 2007). Before so

ruling, however, the panel pointed out "that a majority of our Court has expressed uncertainty

about our precedent holding that strip searches of arrestees to be placed in the jail's general

population, absent reasonable suspicion, violate the Fourth Amendment." Id. at 1312 (citing

Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc)). *Sua sponte*, the Eleventh

Circuit granted rehearing *en banc* to resolve this uncertainty. Order, Powell v. Barrett, No. 05-

16734 (11th Cir. Feb. 1, 2008).

 Sitting *en banc*, the Eleventh Circuit overruled its own precedent with regard to the

constitutionality of blanket arrestee strip search policies and affirmed the dismissal of plaintiffs'

claims. Powell, 541 F.3d at 1306-07, 1314. The Powell opinion now stands alone for the holding

that arrestees' Fourth Amendment rights "are not violated by a policy or practice of strip

searching each one of them as part of the booking process, provided that the searches are no more

intrusive on privacy interests than those upheld in the Bell case." Id. at 1314. In reaching this

holding, the Eleventh Circuit departed from the twenty-five years of contrary circuit precedent

discussed in Part IV.C.2 of this Memorandum.

 The Eleventh Circuit forcefully criticizes that precedent as "thinly disguised defiance" of

the Supreme Court's decision in Bell. Powell, 541 F.3d 1312. Focusing on two main issues—(1)

the validity of the reasonable suspicion standard in the custodial strip search context and (2) the

appropriateness of differentiating between minor offenders and serious offenders in the arrestee

context—Powell refutes the line that other circuits have drawn between contact visit strip

searches and arrestee strip searches in custodial facilities. Contrary to those courts' rulings,

Powell holds that "the security needs that the Court in Bell found to justify strip searching an

inmate re-entering the jail population after a contact visit are no greater than those that justify

searching an arrestee when he is being booked into the general population for the first time." <u>Id.</u> at 1302. For the reasons that follow, this Court disagrees with both the reasoning and holding of the Eleventh Circuit in <u>Powell</u>.

> ### a.   The Source of the Reasonable Suspicion Standard Identified by <u>Powell</u>

The Eleventh Circuit summarized circuit precedent on the constitutionality of arrestee strip searches by stating "[w]e are aware that some courts have interpreted the <u>Bell</u> decision as requiring, or at least permitting lower courts to require, reasonable suspicion as a condition for detention facility searches, especially those that involve visual body cavity inspections. . . . Those decisions misread <u>Bell</u> as requiring reasonable suspicion." <u>Powell</u>, 541 F.3d at 1306-07 (internal citations omitted). This Court disagrees with the Eleventh Circuit's premise and conclusion.

<u>Powell</u> attributes the reasonable suspicion standard to the following sentence in <u>Bell</u>: "We deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause." <u>Bell</u>, 441 U.S. at 560 (emphasis in original); <u>Powell</u>, 541 F.3d at 1309. The Eleventh Circuit assumes that this sentence is the source of the circuit court holdings requiring reasonable suspicion and then states that "neither the question nor the answer compels the conclusion that 'less than probable cause' means 'reasonable suspicion.'" <u>Powell</u>, 541 F.3d at 1309. This Court agrees with <u>Powell</u>'s interpretation of that sentence in <u>Bell</u> but disagrees with <u>Powell</u>'s reading of the cases requiring reasonable suspicion. Those courts, even the courts cited in <u>Powell</u>, did not rely on the untenable premise that, by holding that the contact visit strip searches could be conducted on less than probable cause, <u>Bell</u> affirmatively required reasonable suspicion. <u>See, e.g.</u>, <u>Swain v. Spinney</u>, 117 F.3d 1, 6 (1st Cir. 1997); <u>Weber v. Dell</u>, 804 F.2d 796, 800 (2d Cir. 1986); <u>Mary Beth G. v. City of</u>

Chicago, 723 F.2d 1263, 1273 (7th Cir. 1984).[16]

Circuits other than the Eleventh Circuit relied on the Fourth Amendment's
reasonableness requirement and the balancing test articulated in Bell to strike down suspicionless
custodial strip searches of detained arrestees. Applying that test, circuit courts have ruled that
policies requiring strip searches for all arrestees, regardless of the charges or circumstances, are
unreasonable and therefore unconstitutional. See Part IV.C.2 supra. In the wake of such rulings,
courts had to determine under what circumstances officials would be constitutionally permitted
to search a detained arrestee in accordance with the Fourth Amendment. The reasonable
suspicion standard resulted from that inquiry and not because it was required by Bell. See, e.g.,
Mary Beth G., 723 F.2d at 1273; see also Kennedy v. Los Angeles Police Dep't, 901 F.2d 702,
714-15 (9th Cir. 1990), overruled on other grounds by Hunter v. Bryant, 502 U.S. 224 (1991)
(describing the provenance of the reasonable suspicion standard in the arrestee strip search
context).

In contesting the premise that Bell requires custodial strip searches to be predicated on
reasonable suspicion, Powell focuses on three features of the Bell opinion. First, Bell, in
approving a blanket policy, upheld suspicionless strip searches and rejected a case-by-case
approach to the reasonableness inquiry.[17] Second, the Eleventh Circuit points to Justice Powell's

---

[16] The only cases which state that Bell, itself, "requires" an objective standard, such as
probable cause or reasonable suspicion, are the Eleventh Circuit decisions which preceded
Powell. Justice v. City of Peachtree, 961 F.2d 188, 192 (11th Cir. 1992) ("The Bell balancing test
for reasonableness requires at 'a minimum, that the facts upon which the intrusion is based be
capable of measurement against an objective standard, whether this be probable cause or a less
stringent test.'"(citations and internal quotation marks omitted)); see also Wilson v. Jones, 251
F.3d 1340, 1342-43 (11th Cir. 2001) (quoting Justice); Skurstenis v. Jones, 236 F.3d 678, 682
(11th Cir. 2000) (reiterating, without quoting, the same statement in Justice).

[17] At least one court questions this conclusion. "[J]ust because the searches in Bell were
conducted pursuant to a blanket policy does not mean that reasonable suspicion was lacking. . . .

dissenting opinion in <u>Bell</u> which reads, in its entirety:

> I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case. I therefore dissent on this issue.

<u>Bell</u>, 441 U.S. at 563 (Powell, J., dissenting); <u>Powell</u>, 541 F.3d at 1308. Although the Eleventh Circuit acknowledges the risks inherent in using dissenting opinions to interpret majority holdings, <u>Powell</u>, 541 F.3d at 1308, the court nevertheless relies on Justice Powell's statement as convincing evidence that the majority opinion approved suspicionless strip searches. <u>Id.</u> Finally, the Eleventh Circuit unveils what it considers to be "one momentous fact of Franciscan simplicity": the Bureau of Prisons continues to enforce a blanket policy of strip searching all inmates after contact visits, a policy that has not been challenged since <u>Bell</u>. <u>Id.</u>

At most, these three considerations prove that the Supreme Court, on the facts before it, approved a blanket policy requiring strip searches for all inmates following contact visits as reasonable and did not require searches conducted pursuant to that policy to be based on individualized reasonable suspicion. The Court did not have occasion to rule on the reasonableness of custodial strip searches in other circumstances or under what circumstances reasonable suspicion might be required. <u>See</u> <u>Powell</u>, 541 F.3d at 1316 (Barkett, J., dissenting) (pointing out that "<u>Bell</u> did not validate strip searches in detention settings per se"). The <u>Bell</u> Court did hold that, assuming the Fourth Amendment applies, the Fourth Amendment requires all strip searches or strip search policies in custodial settings to be reasonable. <u>Bell</u>, 441 U.S. at

---

[Contact] visits, by their very nature, may . . . provide the requisite reasonable suspicion for jail officers to justify the blanket search policy." <u>Florence v. Bd. of Chosen Freeholders of Burlington</u>, No. 05-3619, 2009 WL 252174, at *13 (D.N.J. Feb. 4, 2009); <u>accord</u> <u>Powell</u>, 541 F.3d at 1316-17 (Barkett, J., dissenting).

558-59.

This is one of many situations where linguistic precision matters a great deal. Other courts did not hold that <u>Bell</u> "requires" reasonable suspicion; they held that <u>Bell</u> requires reasonableness and that reasonableness, in certain circumstances, requires that searches be based on individualized suspicion of wrongdoing measured against some objective standard such as reasonable suspicion. For this reason, this Court concludes that the <u>Powell</u> opinion does not, in fact, demonstrate that other circuit opinions were wrongly decided or that they misapplied <u>Bell</u>.

> **b.     <u>Powell</u>'s Rejection of the Misdemeanor-Felony Distinction and the Distinction between Contact Visit Strip Searches and Arrestee Strip Searches**

Although the Eleventh Circuit describes the misdemeanor-felony distinction as simply "[o]ne other point . . . worth discussing," it is one of the reasons for the Eleventh Circuit's rejection of circuit precedent and subsequent conclusion that blanket policies are equally justified for contact visit strip searches and arrestee strip searches. Powell, 541 F.3d 1309-14. For this reason, the Court combines its discussion of these issues.

Powell states that "[t]he difference between felonies and misdemeanors or other lesser offenses is without constitutional significance when it comes to detention facility strip searches" because it "finds no basis in the Bell decision, in the reasoning of that decision, or in the real world of detention facilities." Powell, 541 F.3d at 1310. The Eleventh Circuit is correct that the <u>Bell</u> Court did not discuss the distinction between misdemeanors and felonies or, for that matter, the distinction between minor offenders and serious offenders, in relation to the reasonableness of the MCC's contact visit strip search policy.[18] The fact that these distinctions were not

---

[18] To demonstrate that the Supreme Court had occasion to consider this issue, the Eleventh Circuit points out that the MCC housed "detainees facing only lesser charges, people incarcerated for contempt of court, and witnesses in protective custody." <u>Powell</u>, 541 F.3d at

discussed in the contact visit context does not mean, however, that they are never relevant to Fourth Amendment reasonableness balancing.

The distinction between felonies and misdemeanors is relevant in the arrest context because it serves as a rough proxy for whether or not an arrestee will be detained pending trial. For persons arrested on misdemeanors or other minor offenses, detention is usually temporary. The strip searches at issue in this case and in the cases discussed in this Memorandum generally occurred during the intermediary period after arrest and before arraignment, before a bench warrant hearing, or before the posting of bail. For serious offenders who will be detained pending trial and subject to the regular and constitutional incidents of detention, such as contact visit strip searches, an intake strip search represents one of several strip searches to which such pretrial detainees will be subjected. The same cannot be said for minor offenders who will not be detained pending trial. Further, the distinction between minor offenders and serious offenders, which tracks the misdemeanor-felony distinction, impacts the balance between the need for the search and the invasion of rights that the search entails, as discussed in Part IV.C.2.

Powell states that plaintiffs' "best hope for distinguishing Bell lies in the fact that they were strip searched as part of the booking process instead of after contact visits." Powell, 541 F.3d at 1313. The Eleventh Circuit denies the validity of this distinction because "an inmate's initial entry into a detention facility might be viewed as coming after one big and prolonged contact visit with the outside world." Id. Defendant agrees and further argues that "[i]ncoming

_____

1310. However, of these three categories of inmates, only the pretrial detainees were before the Supreme Court. Bell, 441 U.S. at 523-24, 528-30. Further, the Supreme Court did not mention what charges the MCC's pretrial detainees faced. It did, however, note that "[u]nder the Bail Reform Act, a person in the federal system is committed to a detention facility only because no other less drastic means can reasonably ensure his presence at trial." Id. at 524 (internal citation omitted).

inmates have not been under any supervision whatsoever, and obviously present[] a greater security hazard than someone who has just come from an observed visit within the institution." (Def. Mot. at 12.)  This Court is not persuaded by these attempts to place arrestee strip searches under the umbrella of the Bell holding with regard to contact visits. Although recent arrestees might have more opportunity to possess contraband than inmates, opportunity alone does not change the likelihood that a person arrested on non-violent, non-drug offenses actually possesses contraband. It also does not increase the chance that the contraband will be secreted in such a way that it will not be discovered by less invasive searches.

Similarly, in ruling on the pending motion, the Court is not influenced by the fact that some persons do anticipate their own arrests and might have the opportunity to conceal contraband. See Powell, 541 F.3d at 1313 ("Some people surrender when they are notified that a warrant for them is outstanding. . . . [Others] deliberately get themselves arrested.") Such circumstances do not justify an otherwise unreasonable blanket policy. See Newkirk v. Sheers, 834 F. Supp. 772, 789-90 (E.D. Pa. 1993) (rejecting defendants' argument that the strip searches of non-violent protestors pursuant to a blanket policy was reasonable because persons "'who commit actions intending or expecting to go to prison'" threaten institutional security). In cases where arrestees self surrender or deliberately subject themselves to arrest, officials may well have reasonable suspicion to conduct an intake strip search. Shain v. Ellison, 273 F.3d 56, 64 (2d Cir. 2001).

This Court disagrees with Powell's conclusion that the holding in Bell invalidates the analysis of other courts with respect to the reasonableness of blanket strip search policies in the arrestee context. Reasonableness is a flexible standard which allows for consideration of different factors in different contexts. In the arrestee context, a person's charges and the

circumstances of his arrest are relevant for the determination of whether a blanket intake strip

search policy is reasonable. The fact that <u>Bell</u> did not discuss those factors in the contact visit

context, where they were less relevant, is of no moment.

**c.**     **Fourth Amendment Analysis Absent a Factual Record**

The Eleventh Circuit affirmed the dismissal of the Powell plaintiffs' complaint because

"the security needs that the Court in Bell found to justify strip searching an inmate re-entering the

jail population after a contact visit are no greater than those that justify searching an arrestee

when he is being booked into the general population for the first time." Powell, 541 F.3d at 1302.

Defendant strongly supports this conclusion, arguing that Bell bars plaintiffs' claims because

GEO's need for the search policy is "no different" from the need for the policy in Bell. (Def.

Reply at 5-6, 8.) This Court disagrees with this position two reasons. First, it oversimplifies the

"need for the particular search" prong of Bell. Second, it ignores the fact-intensive nature of

Fourth Amendment inquiry.

Maintaining institutional security within custodial facilities obviously qualifies as a

legitimate governmental interest. Bell recognized that "[a] detention facility is a unique place

fraught with serious security dangers." Bell, 441 U.S. at 559. Hudson described "the paramount

interest in institutional security" as "'central to all other corrections goals.'" Hudson v. Palmer,

468 U.S. 517, 527 (1984) (quoting Pell v. Procunier, 417 U.S. 817, 823 (1974)). The Supreme

Court's decision to uphold the strip search policy at issue in <u>Bell</u> was strongly influenced by such

considerations. Bell, 441 U.S. at 560; Powell, 541 F.3d at 1306 (describing the weight the

Supreme Court placed on the security interests of the institution). Nevertheless, the invocation of

"institutional security concerns" does not give defendant carte blanche to implement

constitutionally suspect policies. See Block v. Rutherford, 468 U.S. 576, 593 (1984) (Blackmun,

44

J., concurring) ("The fact that particular measures advance prison security . . . does not make them ipso facto constitutional.") Sufficient justification only exists when the search policy is reasonably calculated to achieve the government's stated goals.

As summarized above in Part IV.C.2.b, courts have consistently concluded that the interests which justified the implementation of a *blanket* policy in the *contact visit* context in Bell—discovery and deterrence—did not justify the implementation of a *blanket* policy in the *arrestee context*. Powell does not address this reasoning. Instead, Powell relies on generalizations and the factual findings in other cases to demonstrate that arrestee strip searches might be warranted under certain circumstances. Powell, 541 F.3d at 1310-11, 1313-14. The hypothetical existence of reasonable arrestee strip searches does not, however, automatically justify an overinclusive *blanket* policy. Further, the fact that a blanket policy might be reasonable in one facility does not mean that a blanket policy will be reasonable in all facilities. Where, as with strip searches, the government action intrudes on an individual's constitutionally protected right to bodily privacy, the search policy must be based on the actual, not hypothetical, needs of the institution. Defendant's claim that institutional security concerns justify all search policies in custodial facilities will not suffice.

The Eleventh Circuit's decision to uphold a blanket strip search policy on appeal from a motion to dismiss does not take into consideration the fact-intensive nature of Fourth Amendment analysis generally and under <u>Bell</u>. <u>Powell</u>, 541 F.3d at 1302. In <u>Bell</u>, the Supreme Court observed that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. *In each case* it requires a balancing of the need for the *particular* search against the invasion of personal rights that the search entails." <u>Bell</u>, 441 U.S. at 559 (emphasis added). "Absent precedent that is clearly controlling, it is incumbent on

[courts] to examine independently [the facts of the challenged searches] in light of the requirement of the [F]ourth [A]mendment that they not be 'unreasonable.'" Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1271 (7th Cir. 1983). The courts of appeals that have assessed the constitutionality of custodial strip searches have all evaluated the reasonableness of those searches in light of the facts of each case and by reference to the Fourth Amendment standard laid out in Bell. This Court is aware of no circuit court other than the Eleventh Circuit in Powell which has upheld the constitutionality of an arrestee strip search without a factual record. Accord Powell, 541 F.3d at 1316 (Barkett, J., dissenting).

Because this Court concludes that the Supreme Court ruling in Bell with regard to contact visit strip searches does not control the constitutionality of custodial strip search policies involving detained arrestees, such as the one alleged by plaintiffs, the Court must independently rule on the reasonableness of such a policy. Without a factual record, however, this Court is unable to balance "the need for the particular search [policy] against the invasion of personal rights that the search [policy] entails" as Bell requires. Bell, 441 U.S. at 559. At this stage in the litigation, the Court can only evaluate whether the allegations in plaintiffs' Amended Complaint state claims upon which relief can be granted.

### D.    Plaintiffs' Fourth Amendment Claims

Having found Powell's criticisms of circuit precedent unpersuasive, this Court will continue to follow the authority of other circuits, as described in Part IV.C.2 of this Memorandum. That authority holds that suspicionless strip searches of detained arrestees upon admission to a custodial facility violate the Fourth Amendment and requires that custodial strip searches of detained arrestees be based on reasonable suspicion that the arrestee has concealed weapons or contraband. In this case, plaintiffs allege that defendant has a policy or practice of

strip searching all arrestees without any individualized suspicion that those arrestees have secreted contraband. The named plaintiffs further allege that they were strip searched upon admission to defendant's Hill Facility and that their strip searches were not based on reasonable suspicion.

The strip searches described in plaintiffs' Amended Complaint involved the visual inspection of the named plaintiffs' naked bodies. Plaintiff Allison was required to squat and cough while naked. Plaintiff Hocevar was required to remove his clothes in the presence of other detainees. While not as invasive as the strip searches in Bell, which involved visual body cavity inspection, plaintiffs' searches were similar to, or more invasive than, the strip searches that have been scrutinized and struck down by other courts. Masters v. Crouch, 872 F.2d 1248, 1253, 1255 (6th Cir. 1989) (skin search in the presence of other people); Hill v. Bogans, 735 F.2d 391, 393, 394-95 (10th Cir. 1984) (same); Giles v. Ackerman, 746 F.2d 614, 615, 617-18 (9th Cir. 1984) (per curiam), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) (skin search).

Also, at least two cases suggest that the named plaintiffs' charges, DUI and domestic dispute charges, do not give rise to reasonable suspicion for the purposes of conducting a custodial strip search on an arrestee. Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) ("[DUI], though not a minor traffic offense, [is] nevertheless [an offense] not commonly associated by its very nature with the possession of weapons or contraband."); Shain v. Ellison, 273 F.3d 56 (2d Cir. 2001) (holding that the custodial strip search of plaintiff, who had been arrested for first degree harassment arising from a domestic dispute, was unconstitutional).

More importantly, however, all courts confronted with the issue have ruled that blanket arrestee strip search policies, such as the one alleged by plaintiffs, are unreasonable and therefore

unconstitutional. <u>See, e.g.</u>, <u>Weber v. Dell</u>, 804 F.2d 796, 803 (2d Cir. 1986); <u>Stewart v. Lubbock County</u>, 767 F.2d 153, 156-157 (5th Cir. 1985); <u>Mary Beth G. v. City of Chicago</u>, 723 F.2d 1263, 1273 (7th Cir. 1983). Under these cases and the other authority cited in this Memorandum, plaintiffs have pled viable Fourth Amendment claims.

**VI.     CONCLUSION**

For all of the foregoing reasons, the Court denies the Motion of Defendant The GEO Group, Inc. for Judgment on the Pleadings. Plaintiffs' claims for relief will be judged against the Fourth Amendment standards summarized in this Memorandum and not the Eleventh Circuit decision in Powell. This ruling is without prejudice to defendant's right to argue the constitutionality of its actions at the summary judgment stage and/or at trial.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNY ALLISON and ZORAN HOCEVAR, **individually and on behalf of a class of others similarly situated,** | : | CIVIL ACTION |
| | : | |
| **Plaintiffs,** | : | |
| | : | NO. 08-467 |
| **v.** | : | |
| | : | |
| THE GEO GROUP, INC., in its official and individual capacities, and JOHN DOES 1 – 100, in their official and individual capacities, | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## O R D E R

**AND NOW**, this 24th day of March, 2009, upon consideration of the Motion of Defendant The GEO Group, Inc. for Judgment on the Pleadings (Document No. 29, filed September 18, 2008), Plaintiffs' Memorandum of Law in Opposition to Defendant The GEO Group, Inc.'s Motion for Judgment on the Pleadings (Document No. 35, filed October 21, 2008), the Reply Memorandum of Law in Support of the Motion of Defendant The GEO Group, Inc. for Judgment on the Pleadings (Document No. 37, filed November 5, 2008), and the related submissions of the parties, for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that the Motion of Defendant The GEO Group, Inc. for Judgment on the Pleadings is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's request for oral argument is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the partial stay on discovery imposed by Order dated October 10, 2008 is **VACATED**. The Court will convene a scheduling conference in due course.


**BY THE COURT:**


 **/s/ Honorable Jan E. DuBois**
 **JAN E. DUBOIS, J.**